NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MARK KRETCHMER,<br><br>              Plaintiff,<br><br>     v.<br><br>BERRY GLOBAL, INC. *et al.*,<br><br>              Defendants. | Civil Action No. 24-01286 (GC) (JBD)<br><br>**OPINION** |

**CASTNER, District Judge**

**THIS MATTER** comes before the Court upon Defendants Berry Global Inc. and Letica Resources Inc. d/b/a/ Berry Freightlines's (collectively, Berry) Motion for Summary Judgment under Federal Rule of Civil Procedure (Rule) 56.  (ECF No. 33.)  Plaintiff Mark Kretchmer opposed, and Berry replied.  (ECF Nos. 38, 39.)  The Court has carefully reviewed the parties' submissions and decides the matter without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b).  For the reasons set forth below, and other good cause shown, Berry's Motion for Summary Judgment is **GRANTED**.

I.      **BACKGROUND**

        A.      **Factual Background[1]**

        Defendant Berry Global, Inc. is a global manufacturer of plastic packaging products.  (ECF No. 33-2 ¶ 1; ECF No. 38-1A ¶ 1.)  Defendant Berry Freightlines is an interstate freight carrier

---

[1]      On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party." *Jaffal v. Dir. Newark N.J. Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (quoting *Bryan v. United States*, 913 F.3d 356, 361 n.10 (3d Cir. 2019)).  The factual circumstances surrounding this action, as revealed through discovery, are set forth in the parties' submissions in accordance with Local

that transports freight for and is a wholly owned subsidiary of Berry Global.  (ECF No. 2; ECF No. 33-2 ¶ 2; ECF No. 38-1A ¶ 2.)  Plaintiff Mark Kretchmer worked as a Berry trailer driver from November 9, 2021 until his termination on August 21, 2023.  (ECF No. 33-2 ¶¶ 3-4; ECF No. 38-1A ¶¶ 3-4; ECF No. 38-1B ¶ 1; ECF No. 39-1 ¶ 1.)  Plaintiff reported to Berry's location in Cranbury, New Jersey, (ECF No. 33-2 ¶ 5; ECF No. 38-1A ¶ 5), and at the time of his hiring, Plaintiff was tasked with performing "shuttle runs," in which he would move Berry's products between Berry's Cranbury and Monroe Township, New Jersey facilities, (ECF No. 38-1B ¶¶ 4-5; ECF No. 39-1 ¶¶ 4-5).  This matter concerns whether Plaintiff was unlawfully retaliated against for reporting trailer safety concerns to Berry management in November 2021 and reporting his colleague to law enforcement for breaking geese eggs in April 2023.

### 1.  *Plaintiff's November 2021 Trailer Safety Complaints*

In his first weeks at Berry, Plaintiff observed that the trailers assigned to shuttle drivers were unsafe.  (ECF No. 38-1B ¶ 6; ECF No. 39-1 ¶ 6.)  Plaintiff recalled first reporting his concerns to Berry Dispatcher Anthony Lopez, Plaintiff's direct supervisor, about these safety issues, but Lopez took no action.  (ECF No. 38-1B ¶¶ 7-10; ECF No. 39-1 ¶¶ 7-10.)  Plaintiff believed Lopez avoided acting in order to "protect [Lopez's] position."  (ECF No. 38-1B ¶ 10; ECF No. 39-1 ¶ 10.)  Plaintiff also called and emailed Fleet Manager Mike Trombley about the trailers.  (ECF No. 38-1B ¶ 18; ECF No. 39-1 ¶ 18.)  Trombley confirmed receipt of the reports and stated that the trailer

---

Civil Rule 56.1.  Berry's Statement of Undisputed Material Facts is at ECF No. 33-2, Plaintiffs' Response to Berry's Statement of Material Facts and Statement of Additional Material Facts are at ECF No. 38-1, and Berry's Response to Plaintiff's Additional Material Facts is at ECF No. 39-1.  Because Plaintiff's Response to Berry's Statement of Material Facts and Statement of Additional Material Facts are both at ECF No. 38-1 and both begin with Paragraph 1, when the Court refers to the former it will cite to ECF No. 38-1A and when it cites to the latter it will cite to ECF No. 38-1B.  Unless otherwise noted, the relevant facts are undisputed or supported by record evidence.

issues would be addressed.  (ECF No. 38-1B ¶ 19; ECF No. 39-1 ¶ 19.)  Plaintiff also contacted Safety Director Gary Miles, Plant Manager Lica Jackson, and Operations Manager William Berger about the trailers.  (ECF No. 33-2 ¶¶ 6, 16; ECF No. 38-1A ¶¶ 6, 16.)  Between November 15 and 19, 2021, Plaintiff compiled a series of Driver Vehicle Inspection Reports documenting the trailers' defects and gave them to Jackson so that she could forward them to Berry corporate.  (ECF No. 38-1B ¶¶ 22-23; ECF No. 39-1 ¶¶ 22-23.)

Other shuttle drivers, including Plaintiff's colleague Kerry O'Keefe, were aware of Plaintiff's complaints about the trailers.  (ECF No. 38-1B ¶¶ 11, 14; ECF No. 39-1 ¶¶ 11, 14.) These shuttle drivers perceived Plaintiff's safety complaints as disruptive, contributing to tension between them.  (ECF No. 38-1B ¶ 35; ECF No. 39-1 ¶ 35.)  O'Keefe told Plaintiff he should "shut up" because O'Keefe feared that certain operations would shut down if the trailers were improper and O'Keefe would be laid off.  (ECF No. 33-2 ¶ 23; ECF No. 38-1A ¶ 23; ECF No. 38-1B ¶ 17; ECF No. 38-3 at 12; ECF No. 39-1 ¶ 17.)[2]  Berger described the issues at the facility as "two grown men that couldn't get along."  (ECF No. 38-1B ¶ 38; ECF No. 39-1 ¶ 38.)  When asked in his deposition what led Berger to believe that Plaintiff and O'Keefe could not get along, he replied "[j]ust the constant back and forth.  The complaining . . . ." and stated "a lot of complaining was obviously the health of the fleet as far as the trailers."  (ECF No. 38-1B ¶ 39; ECF No. 39-1 ¶ 39.)

General Manager Ken Lilly sent Trombley and Miles to Cranbury to inspect the trailers in response to Plaintiff's concerns.  (ECF No. 33-2 ¶ 7; ECF No. 38-1A ¶ 7.)  Upon inspection, they confirmed certain equipment was unsuitable.  (ECF No. 38-1B ¶ 26; ECF No. 39-1 ¶ 26.)  On December 1, 2021, Miles sent pictures of the leased trailers to Lilly.  (ECF No. 33-2 ¶ 8; ECF No.

---

[2]	Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

38-1A ¶ 8.)  In his December 1, 2021, email to Lilly, Miles wrote that the leased trailers were not repairable and should be replaced as soon as possible.  (ECF No. 33-2 ¶ 9; ECF No. 38-1A ¶ 9.) Lilly instructed Trombley and Miles to find a new trailer vendor.  (ECF No. 33-2 ¶ 10; ECF No. 38-1A ¶ 10.)  They subsequently ordered new shuttle trailers.  (ECF No. 38-1B ¶ 29; ECF No. 39-1 ¶ 29.)  Later in December 2021, Trombley took the Cranbury drivers out to dinner and told them that new trailers would be coming.  (ECF No. 38-1B ¶¶ 30-31; ECF No. 39-1 ¶¶ 30-31.)  Around the same time, Lilly attended a team dinner with the drivers to address the tension between, primarily, O'Keefe and Plaintiff, and Lilly observed temporary improvement.  (ECF No. 38-1B ¶¶ 41-42; ECF No. 39-1 ¶¶ 41-42.)  The trailers arrived in January 2022.  (ECF No. 33-2 ¶¶ 11-12; ECF No. 38-1A ¶¶ 11-12.)

Also around this time, Human Resources Manager June Phillips called Plaintiff and asked Plaintiff whether he would like to switch from working shuttle routes to a "regular route."  (ECF No. 38-3 at 14.)  A "regular route" would involve driving from one manufacturing plant to another to pick up products and then delivering those products to customers.  (*Id.*)  Drivers on these routes use newer trailers.  (*Id.*)  Plaintiff agreed and thereafter drove a regular route between New Jersey and Pennsylvania.  (ECF No. 38-1B ¶ 32; ECF No. 39-1 ¶ 32.)  From January 2022 until the termination of his employment in August 2023, Plaintiff would usually drive an empty trailer from Berry's Cranbury location to Berry's Pittston, Pennsylvania location to pick up freight, deliver the freight to one of Berry's customers, and then return the trailer to Cranbury.  (ECF No. 33-2 ¶ 26; ECF No. 38-1A ¶ 26.)  Lopez testified that Plaintiff's routes were changed due to Plaintiff's safety complaints.  (ECF No. 38-1B ¶ 34; ECF No. 39-1 ¶ 34.)  Plaintiff testified that "once I got the new [trailers] for [the shuttle drivers], then [Berry] offered me the [New Jersey to Pennsylvania] route and the route was fine. I had no problem with it at all."  (ECF No. 38-3 at 48.)  Plaintiff also

4

testified that if he were offered to return to the shuttle route, with the new trailers, he "might have" accepted the offer.  (*Id.*)  The parties agree that Plaintiff was not disciplined for raising concerns about trailer conditions.  (ECF No. 33-2 ¶ 21; ECF No. 38-1A ¶ 21.)  Plaintiff did not have many interactions with Trombley and Miles after January 2022.  (ECF No. 33-2 ¶ 15; ECF No. 38-1A ¶ 15.)

### 2.   *Plaintiff's April 2023 Geese Eggs Complaint*

In the spring of 2023, geese built nests near Berry's Cranbury facility and laid eggs in those nests.  (ECF No. 38-1B ¶ 43; ECF No. 39-1 ¶ 43.)  O'Keefe chased the geese away and broke some of the eggs.  (ECF No. 38-1B ¶ 44; ECF No. 39-1 ¶ 44.)  Plaintiff observed the aftermath of O'Keefe stomping on the geese nests, testifying that he saw O'Keefe "kick a nest, but it was . . . right after O'Keefe [broke the eggs] and it was more than obvious what [O'Keefe] just did . . . . But [Plaintiff] did not see the actual act [him]self."  (ECF No. 38-1B ¶ 45; ECF No. 38-3 at 29; ECF No. 39-1 ¶ 45.)  Plaintiff testified that fellow driver Frankie Richardson observed O'Keefe break the eggs, and that information was relayed to driver Tad Richardson, who told Plaintiff.  (ECF No. 38-3 at 32.)  When Plaintiff learned that O'Keefe had broken the eggs, he told Tad Richardson, "I'm just going to tell the Monroe police."  (ECF No. 33-2 ¶ 32; ECF No. 38-1A ¶ 32.)

On or around April 19, 2023, Plaintiff contacted the Monroe Police Department to make an anonymous report that O'Keefe disturbed geese nests and broke the geese eggs.  (ECF No. 33-2 ¶ 30; ECF No. 38-1A ¶ 30.)  The anonymous report does not indicate that Plaintiff previously informed Berry representatives about the incident, and the parties agree Plaintiff did not provide Berry notice in writing that he was going to file the report.  (ECF No. 33-2 ¶¶ 33, 35; ECF No. 38-1A ¶¶ 33, 35.)  Plaintiff testified that the only Berry employees he told about the report were fellow driver Tad Richardson and Human Resources Manager Angie Cardona.  (ECF No. 38-3 at 33.)  Plaintiff believed he told Cardona over the telephone before he filed the report, but he could not

recall definitively; Plaintiff stated that he might have also "told [Cardona] after [filing the report] that it was filed." (*Id.* at 30, 33; *see also* ECF No. 33-2 ¶ 38; ECF No. 38-1A ¶ 38.) Regardless of when Plaintiff told Cardona, Plaintiff testified that he wanted Cardona to know about the police report because he "was hoping to be protected somehow from the whistle-blower status type of thing." (ECF No. 33-2 ¶ 39; ECF No. 38-1A ¶ 39; ECF No. 38-3 at 33.)[3] Plaintiff told the police he was making his report anonymously because he feared retaliation from Berry. (ECF No. 33-2 ¶ 36; ECF No. 38-1A ¶ 36; ECF No. 38-9 at 3.)

After filing the report, Plaintiff testified that the only other person he spoke to about it—apart from Cardona—was fellow driver, Tad Richardson. (ECF No. 33-2 ¶ 40; ECF No. 38-1A ¶ 40.) Lopez testified, however, that Plaintiff informed Lopez of the geese incident during a telephone call, though it is not clear when this call took place. (ECF No. 38-1A ¶ 40; ECF No. 38-1B ¶ 55; ECF No. 39-1 ¶ 55.) Lopez testified that he would have relayed the information to Berry upper management including Berger, Lilly, and Human Resources. (ECF No. 38-1B ¶ 55; ECF No. 38-4 at 14; ECF No. 39-1 ¶ 55.)

On or around May 2, 2023, a game warden from the New Jersey Department of Environmental Protection, Division of Fish and Wildlife, informed a Berry officer of the anonymous police report. (ECF No. 33-2 ¶ 42; ECF No. 38-1A ¶ 42; ECF No. 38-6 at 17.) That officer reached out to Berry's Human Resources department, and the department reached out to O'Keefe. (ECF No. 38-6 at 17.) Lilly learned about the anonymous report from O'Keefe, and Lilly advised O'Keefe to remain calm: "my advice to [O'Keefe] was calm down, let's wait until

---

[3]    On May 25, 2023, despite having already told Cardona that he was the author of the anonymous report, Plaintiff emailed Cardona that he "did not turn [O'Keefe] in at all." (ECF No. 33-2 ¶ 41; ECF No. 33-4 at 132; ECF No. 38-1A ¶ 41.)

you talk to the . . . officer to see exactly what the situation is and then we can deal with things after that." (*Id.*)

After speaking with O'Keefe, Lilly reported the geese incident to Berger and Cardona. (ECF No. 33-2 ¶ 43; ECF No. 38-1A ¶ 43; ECF No. 38-1B ¶¶ 56-59; ECF No. 39-1 ¶¶ 56-59.) On May 2, 2023, Lilly and Cardona interviewed O'Keefe at which point O'Keefe admitted to disturbing a goose nest near where he parked because the goose was attacking him. (ECF No. 33-2 ¶¶ 44-45; ECF No. 38-1A ¶¶ 44-45; ECF No. 38-1B ¶¶ 60-61; ECF No. 39-1 ¶¶ 60-61.) O'Keefe was required to meet with Berry Human Resources in Monroe Township and spoke with a game warden over the phone, and O'Keefe admitted he broke the eggs to both. (ECF No. 38-1B ¶¶ 62-64; ECF No. 39-1 ¶¶ 62-64.) Berry submits that on the same day that Lilly and Cardona interviewed O'Keefe, Berry issued O'Keefe a "Corrective Action Notice," (ECF No. 33-2 ¶ 46; ECF No. 33-4 at 125; ECF No. 38-1B ¶¶ 67-68; ECF No. 39-1 ¶¶ 67-68), but O'Keefe testified that he never received this Corrective Action Notice and just received a verbal warning from Lilly, (ECF No. 38-1A ¶ 46; ECF No. 38-5 at 14-15). On May 8, 2023, O'Keefe was issued a $124 ticket by the New Jersey Department of Environmental Protection, Division of Fish and Wildlife. (ECF No. 38-1B ¶¶ 74-75; ECF No. 38-13 at 2; ECF No. 39-1 ¶¶ 74-75.) O'Keefe relayed this information to Lilly, and Lilly responded: "Not near as bad as I thought . . . . Send it to Cherisse.[4] I will pay it. . . . Give it to her tomorrow and she will pay immediately . . . I believe you were acting in company's best interest on this[.]" (ECF No. 38-14 at 2-3.) Lilly followed that message up with: "[I] want to make sure [Cherisse doesn't think] it's something she needs to look into. Just pay the ticket." (*Id.* at 4.)

---

[4]   Cherisse Gergis was Berry's Environmental, Health, and Safety Manager. (ECF No. 38-6 at 9.)

O'Keefe believed Plaintiff filed the anonymous report, and friction ensued between them. (ECF No. 38-1B ¶¶ 65-66; ECF No. 39-1 ¶¶ 65-66.) On the morning of May 5, 2023, O'Keefe texted Cardona that Plaintiff "came to work with an axe." (ECF No. 38-1B ¶ 69; ECF No. 38-5 at 17; ECF No. 39-1 ¶ 69.) Later that day, Human Resources employee Janet Quintana sent an email to Lilly and Cardona stating: "There is an issue that I think you will need to handle with [O'Keefe] and [Plaintiff]. I believe [O'Keefe] thinks [Plaintiff] was the one who called the cops on him . . . . Seems to me like [O'Keefe] is retaliating against [Plaintiff] or vice versa because he feels that [Plaintiff] was the one who called the cops on him." (ECF No. 38-1B ¶ 70; ECF No. 38-11 at 2; ECF No. 39-1 ¶ 70.) Human Resources investigated whether Plaintiff threatened O'Keefe with the axe but found no video evidence supporting a threat. (ECF No. 38-1B ¶ 73; ECF No. 38-5 at 17; ECF No. 39-1 ¶ 73.) On May 16, 2023, while walking past Plaintiff, O'Keefe said to Plaintiff, "why don't you try harder you fucking asshole," followed up by something to the effect of, "you're going to get yours." (ECF No. 33-2 ¶ 48; ECF No. 38-1A ¶ 48; ECF No. 38-3 at 36.) On May 19, 2023, Berry separated O'Keefe and Plaintiff so they would not need to interact at all going forward. (ECF No. 33-2 ¶ 49; ECF No. 38-1A ¶ 49.) Starting May 19, 2023, for example, O'Keefe began parking at Berry's new warehouse in Millstone, New Jersey, while Plaintiff continued to park at the Cranbury, New Jersey location. (ECF No. 33-2 ¶ 50; ECF No. 38-1A ¶ 50.) After Berry separated O'Keefe and Plaintiff on May 19, 2023, O'Keefe testified that they had no further interactions. (ECF No. 33-2 ¶ 51; ECF No. 38-1A ¶ 51; ECF No. 38-5 at 18.)

However, the animosity continued. On July 18, 2023, a Shipping Coordinator at another facility, Gene Monchelli, emailed Lopez, Cardona, and Plaintiff that O'Keefe "came into my office and spent a long time talking about his hatred for [Plaintiff]" stemming from the geese incident. (ECF No. 38-1B ¶¶ 79-80, 82, 86; ECF No. 39-1 ¶¶ 79-80, 82, 86.) On July 21, 2023, Plaintiff

8

advised the Monroe Township Police Department that he wanted to get an order of protection against O'Keefe because he was "fearful for his safety, fearful of losing his job, and fearful that [O'Keefe] has access to firearms." (ECF No. 38-1B ¶ 83; ECF No. 39-1 ¶ 83.) Plaintiff became especially fearful upon receiving the email from Monchelli and upon finding out, through a search on Spokeo.com, that O'Keefe had a criminal history. (*See* ECF No. 38-16 at 3.) O'Keefe had been charged with simple assault and domestic violence within the last three years. (ECF No. 38-1B ¶ 89; ECF No. 39-1 ¶ 89.)

On July 24, 2023, Plaintiff emailed Cardona regarding O'Keefe's "hate filled tirade" that Monchelli reported. (ECF No. 38-1B ¶ 87; ECF No. 39-1 ¶ 87.) Cardona replied that Berry already handled the issue. (ECF No. 38-1B ¶ 88; ECF No. 39-1 ¶ 88.) Cardona verbally warned O'Keefe about his behavior and that he may be terminated. (ECF No. 38-1B ¶ 90; ECF No. 39-1 ¶ 90.) A Corrective Action Notice, dated July 21, 2023, memorialized the verbal warning and stated that "[r]etaliation of any sort is strictly prohibited" and "[i]f you have concerns or grievances, please follow the appropriate channels for addressing them without retaliating." (ECF No. 38-1B ¶ 91; ECF No. 38-19 at 2; ECF No. 39-1 ¶ 91.) Berry submits that it sent the document to O'Keefe for signature on July 25, 2023, but O'Keefe testified that he did not recall receiving it. (ECF No. 38-1B ¶¶ 93-95; ECF No. 38-19 at 2; ECF No. 39-1 ¶¶ 93-95.)

### 3. *Plaintiff's August 21, 2023 Termination*

A few months before Plaintiff was terminated, Berry began to end manufacturing operations at its Middletown, Delaware manufacturing plant. (ECF No. 33-2 ¶ 52; ECF No. 38-1A ¶ 52; ECF No. 38-6 at 21.) Lilly testified that when Berry shut down that facility, the closure "reduced the freight volume in that area." (ECF No. 38-6 at 21.) And with the reduced freight, Lilly was instructed by Director of Logistics Darryl Chamberlain to "reduce manpower within [Berry] Freightlines." (*Id.*) When Lilly was asked during his deposition whether he was

9

"instructed to reduce manpower that was going to be directly affected by [the Middletown, Delaware] closing or just reduce manpower across the fleet," Lilly responded that "[t]he answer to that is yes to both . . . where the reductions would be in regards to the fleet, [Middletown, Delaware] would be the first place to look, but if I cannot hit the specific number where else do I need to reduce the number." (ECF No. 38-6 at 23.) When asked with whom Lilly consulted to identify roles that were not necessary for Berry's operations, Lilly responded that he "would have consulted with . . . Lopez." (*Id.* at 25.) Lopez testified that he recalled one phone conversation with Lilly in which they discussed whom to terminate. (ECF No. 38-4 at 5-6.) Lopez was not "a hundred percent sure who suggested" that Plaintiff be terminated, but Lopez believed he made the suggestion because the "the whole point of the call was [Lilly] asking who in my area would be a driver that maybe would be doing a role that was not necessary and I would have suggested [Plaintiff] due to what his specific role was at the time." (*Id.* at 6.)

In August 2023, the Cranbury, New Jersey facility had six drivers: Plaintiff, O'Keefe, Ed Zapata, Tad Richardson, Frankie Richardson, and Frank Morrero. (ECF No. 33-2 ¶ 60; ECF No. 38-1A ¶ 60.) Berry submits that during this time, the Cranbury facility only "needed" five drivers. (ECF No. 33-2 ¶ 59.) Plaintiff submits that these were not the facilities "needs." (ECF No. 38A-1 ¶ 59.) Both parties rely on Lopez' testimony, which states that at the Cranbury location "we need to have three drivers that are capable of taking the New York runs . . . and then two drivers for shuttles." (ECF No. 38-4 at 16.) Three drivers—O'Keefe, Tad Richardson, and Frankie Richardson—regularly delivered freight from the Cranbury, New Jersey facility to New York. (ECF No. 33-2 ¶ 62; ECF No. 38-1A ¶ 62.) Two drivers, Zapata and Morrero, regularly performed local shuttle runs. (ECF No. 33-2 ¶ 63; ECF No. 38-1A ¶ 63.)

10

From January 2022 until August 2023, Plaintiff was not regularly delivering freight out of the Cranbury, New Jersey facility to New York nor was he regularly performing the local shuttle runs that he was assigned to before January 2022.  (ECF No. 33-2 ¶¶ 64-65; ECF No. 38-1A ¶¶ 64-65.)  Instead, during the January 2022 to August 2023 timeframe, Plaintiff was regularly delivering freight out of the Pittston, Pennsylvania facility.  (ECF No. 33-2 ¶ 66; ECF No. 38-1A ¶ 66.)  Lilly testified that Berry "didn't need" Plaintiff to make the long trip from Cranbury to Pittston because "we have a driver base [in Pittston] that could cover those loads."  (ECF No. 38-6 at 24.)  Lopez similarly testified that "[w]e technically had drivers in Pittston so it would make sense for them to cover it" in comparison to Plaintiff who would have to travel a long distance just to load cargo from Pittston.  (ECF No. 38-4 at 15.)

Lilly also stated that Plaintiff "refused to go into New York," though Lilly could not recall whether he called Plaintiff to reconsider this refusal before terminating him.  (ECF No. 38-6 at 24.)  Plaintiff, however, testified that he did not recall ever refusing a route assignment at Berry.  (ECF No. 38-1B ¶ 119; ECF No. 39-1 ¶ 119.)  Berger stated that, in general, a driver's willingness or unwillingness to take certain work was a factor managers considered alongside volume in making termination decisions.  (ECF No. 38-1B ¶ 118; ECF No. 39-1 ¶ 118.)  Berger also testified that seniority is a factor when making reduction-in-force decisions.  (ECF No. 38-1B ¶ 121; ECF No. 39-1 ¶ 121.)  But Lilly testified that seniority was not factored into the decision to terminate Plaintiff.  (ECF No. 38-1B ¶ 122; ECF No. 39-1 ¶ 122.)

On August 4, 2023, following Chamberlain's direction to reduce headcount, Lilly provided Chamberlain with a list of five roles to be eliminated as part of the reduction in force, and that list included three roles from the Middletown, Delaware facility; one role from the Morgantown, Pennsylvania facility; and one role (Plaintiff's role) from the Cranbury, New Jersey facility.  (ECF

11

No. 33-2 ¶ 69; ECF No. 38-1A ¶ 69; ECF No. 33-4 at 135, 137.)[5]  The list that Lilly provided to Chamberlain indicated that the reasons Plaintiff was included in the reduction in force were (1) a decrease in volume in Cranbury; and (2) the fact that Plaintiff's route—driving an empty trailer from Cranbury to Pittston and then loading freight in Pittston to be delivered to customers—could be performed by drivers in Pittston.  (ECF No. 33-2 ¶ 70; ECF No. 38-1A ¶ 70; ECF No. 38-1B ¶ 99; ECF No. 38-21 at 2; ECF No. 39-1 ¶ 99.)

Around August 16, 2023, Cardona received an email from Lilly with notes listing individuals who were being laid off, including drivers Cardona supported through her role as Human Resources Manager; Cardona had not been aware of specific driver eliminations before receiving Lilly's notes.  (ECF No. 38-1B ¶ 100; ECF No. 39-1 ¶ 100.)  Cardona testified that she and Lilly had no prior conversations about terminating Plaintiff, and she had no input into the termination decision.  (ECF No. 38-1B ¶ 101; ECF No. 38-8 at 21-22; ECF No. 39-1 ¶ 101.)  Cardona had concerns about terminating an individual who had previously filed complaints, but Cardona believed her Human Resources director, Ashley Lindmuth, would have been part of the termination decision.  (ECF No. 38-1B ¶ 106; ECF No. 38-8 at 21-22; ECF No. 39-1 ¶ 106.)  However, the parties agree that it was ultimately Lilly who made the decision to terminate Plaintiff.  (ECF No. 38-1B ¶ 102; ECF No. 39-1 ¶ 102.)

Plaintiff's employment with Berry was terminated on August 21, 2023.  (ECF No. 33-2 ¶ 72; ECF No. 38-1A ¶ 72.)  Lilly and Cardona called Plaintiff to inform him that he was being laid off because business slowed down.  (ECF No. 33-2 ¶ 73; ECF No. 38-1A ¶ 73.)  Plaintiff was issued a termination letter, which stated that "your position at Berry Freightlines has been eliminated effective August 21, 2023 due to a reduction in business at our facility."  (ECF No. 38-

---

[5]    This list included a sixth role that was already eliminated.  (*See* ECF No. 33-4 at 135.)

1B ¶ 109; ECF No. 39-1 ¶ 109.)  Cardona testified that performance or conduct issues did not influence Plaintiff's termination.  (ECF No. 38-1B ¶ 110; ECF No. 39-1 ¶ 110.)  Lilly cited reduced workload originating from Cranberry as a factor, attributed to customer orders and seasonal variations, but Lilly testified there were no formal documents memorializing the Cranbury volume reductions.  (ECF No. 38-1B ¶ 111; ECF No. 39-1 ¶ 111.)  However, when Lopez was asked whether "the volume levels of what was being run from Cranberry decreased . . . [i]n or around the time of [Plaintiff's] separation," Lopez testified that "I wouldn't say it would decrease, no, not that I'm aware of."  (ECF No. 38-4 at 16.)  The parties dispute whether Lopez meant the volume did not decrease *prior to* Plaintiff's termination or did not decrease *at the time of* his termination.  (*See* ECF No. 38-1B ¶ 113; ECF No. 39-1 ¶ 113.)

Following Plaintiff's termination, a driver that reported to the Pittston facility began performing the route that was previously assigned to Plaintiff.  (ECF No. 33-2 ¶ 74; ECF No. 38-1A ¶ 74.)  Since Plaintiff's termination on August 21, 2023, the Cranbury facility has had five active drivers.  (ECF No. 33-2 ¶ 75; ECF No. 38-1A ¶ 75.)

### B.   Procedural Background

On January 12, 2024, Plaintiff filed a one-count Complaint in the Superior Court of New Jersey, Middlesex County, asserting violations of the New Jersey Conscientious Employee Protection Act (CEPA), N.J. Stat. Ann. § 34:19-1 *et seq*.  (ECF No. 1-2 at 4-8.)  Berry timely removed the matter to this Court.  (ECF No. 1.)[6]  The parties proceeded to discovery without any

---

[6]     The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.  Plaintiff is a citizen of New Jersey; Berry Global, Inc. is a citizen of Delaware and Indiana; Berry Freightlines is a citizen of Michigan and Indiana; and the amount in controversy exceeds $75,000.  (*See* ECF No. 1 at 2-4; ECF No. 1-2 at 4; ECF No. 2 at 1.)

dispositive motion practice, and after the competition of discovery, Berry filed the instant Motion for Summary Judgment on October 8, 2025.  (ECF No. 33.)

## II.   LEGAL STANDARD

Summary judgment shall be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* When deciding the existence of a genuine dispute of material fact, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id.* at 251-52.  The Court must grant summary judgment if any party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; *see also Roofer's Pension Fund v. Papa*, 687 F. Supp. 3d 604, 616 (D.N.J. 2023) ("In the face of a properly supported summary judgment motion, the nonmovant's burden is rigorous: the party 'must point to concrete evidence in the record'—mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment." (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 484 (3d Cir. 1995))).  "[I]nferences, doubts, and issues of credibility should be resolved against the moving party."  *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983).

## III.   DISCUSSION

CEPA is intended to protect whistleblowers from retaliation by their employers.  *Lippman v. Ethicon, Inc.*, 119 A.3d 215, 224 (N.J. 2015).  The Act is designed to "encourage employees to

14

report illegal or unethical workplace activities and to discourage public and private sector employers from engaging in such conduct." *Id.* at 225 (quoting *Abbamont v. Piscataway Twp. Bd. of Educ.*, 650 A.2d 958, 971 (N.J. 1994)).   CEPA applies where an employee reports their coworker's misconduct. *Higgins v. Pascack Valley Hosp.*, 730 A.2d 327, 338 (N.J. 1999) ("CEPA prohibits an employer from taking retaliatory action against an employee who has a reasonable basis for objecting to a co-employee's activity, policy, or practice covered [by CEPA]."). Analyzing a CEPA claim based on circumstantial evidence requires a three-part inquiry established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).   "First, the court must determine if the plaintiff has established a prima facie case of retaliatory discharge[.]" *Morro v. DGMB Casino LLC*, 112 F. Supp. 3d 260, 282 (D.N.J. 2015).   If a plaintiff makes out a *prima facie* case, "the burden shifts to [the] defendant to articulate some legitimate nondiscriminatory reason for making the adverse employment decision." *Id.*   If the defendant meets that burden, "the burden shifts back to the plaintiff, who, in order to survive summary judgment, must raise an issue of fact that the articulated reason is a pretext for the retaliation or that a discriminatory reason more likely motivated the employer." *Id.*

Plaintiff ties his CEPA claims to two events: (1) reporting the unsafe shuttle trailers to Berry management and (2) filing the police report concerning O'Keefe's destruction of geese eggs.  (ECF No. 38 at 6.)  Accordingly, the Court will proceed with the three-step CEPA analysis for each event.

### A.    *Prima Facie* Case of Retaliation

To establish a *prima facie* case of retaliation, Plaintiff must demonstrate that

> (1) [he] reasonably believed that [Berry's] conduct was violating either a law, rule, or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) [he] performed a 'whistle-blowing' activity described in N.J. Stat. Ann. § 34:19-3c; (3) an adverse employment action was taken against [him]; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

15

*Barnes v. Monmouth Cnty. Div. of Soc. Servs.*, Civ. No. 18-07752, 2024 WL 4712483, at *8 (D.N.J. Nov. 7, 2024) (citing *Dzwonar v. McDevitt*, 828 A.2d 893, 900 (N.J. 2003)); *see also Donofry v. Autotote Sys., Inc.*, 795 A.2d 260, 269 (N.J. Super. Ct. App. Div. 2001). At the *prima facie* stage, the evidentiary burden is "rather modest." *Dolinski v. Borough of Watchung*, Dkt. No. A-1350-20, 2022 WL 2542356, at *7 (N.J. Super. Ct. App. Div. July 8, 2022) (quoting *Zive v. Stanley Roberts, Inc.*, 867 A.2d 1133, 1139 (N.J. 2005)).

### 1.    *Trailer Safety Complaints*

With respect to the November 2021 trailer safety complaints, Berry only disputes whether Plaintiff has satisfied the fourth element—causal connection—of the *prima facie* case. (*See* ECF No. 33-1 at 9-12.) Berry argues that "[t]he twenty-two-month time-gap simply does not support any causal connection between the November 2021 concerns that [Plaintiff] raised and his termination nearly two full years later in August 2023" and Plaintiff "has not shown that [Berry] has engaged in intervening antagonism or conduct" to overcome the time-gap. (*Id.* at 9, 11.) Plaintiff responds that the chain of events from Plaintiff's protected activity to his termination show retaliatory bias and antagonism. (*See* ECF No. 38 at 20-26.)

In evaluating the causal connection prong of the *prima facie* case, courts have "focused on the timing of the retaliatory action and any evidence of ongoing antagonism." *Calabria v. State Operated Sch. Dist. for City of Paterson*, Civ. No. 06-6256, 2008 WL 3925174, at *6 (D.N.J. Aug. 26, 2008) (citing *Schlichtig v. Inacom Corp.*, 271 F. Supp. 2d 597, 609 (D.N.J. 2003)); *see also Damiani v. CMG Mortg. Inc.*, Civ. No. 22-04783, 2024 WL 2746086, at *8 (D.N.J. May 28, 2024). "While not determinative, courts have permitted an inference of causation where there exists a short interval between the adverse employment action and the protected activity." *Calabria*, 2008 WL 3925174, at *6 (citation omitted). "[C]ourts look to correlative federal law to supply the relevant standards for evaluating a retaliatory discharge claim under New Jersey law." *Bobo v.*

*Wildwood Pub. Sch. Bd. of Educ.*, Civ. No. 13-5007, 2014 WL 7339461, at \*13 (D.N.J. Dec. 23, 2014) (internal quotation marks and citation omitted.)  In the Title VII retaliation context, the Third Circuit has held that "[a]lthough there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007).

When the temporal proximity is not unduly suggestive, courts have looked to a "pattern of antagonism following the protected conduct," *Kachmar v. SunGard Data Sys.*, *Inc.*, 109 F.3d 173, 177 (3d Cir. 1997), or "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action," *Lowery v. Yoram Koby & JYK, Inc.*, Civ. No. 11-5088, 2016 WL 324948, at \*5 (D.N.J. Jan. 26, 2026) (internal quotation marks and citations omitted).  However, there is no magic formula a CEPA plaintiff must follow to prove a causal connection; instead, the Third Circuit requires a holistic review and "allows a plaintiff to rely on a broad array of evidence to demonstrate a causal link between his protected activity and the adverse action taken against him." *Tegler v. Glob. Spectrum*, 291 F. Supp. 3d 565, 589 (D.N.J. 2018) (internal quotation marks and citation omitted).

Here, the Court finds Plaintiff has failed to establish a causal connection between the November 2021 trailer complaints and the August 2023 termination.  Because these events were nearly two years apart, (ECF No. 38-1B ¶¶ 22-23, 109; ECF No. 39-1 ¶¶ 22-23, 109), Plaintiff must provide evidence of something more for the Court to find he has established his *prima facie* case, *LeBoon*, 503 F.3d at 233; *Calabria*, 2008 WL 3925174, at \*6.[7]  But Plaintiff is unable to do

---

[7]    The parties dispute whether Plaintiff filed any further trailer safety complaints after Berry fixed the trailers in January 2022. (*See* ECF No. 33-2 ¶ 14; ECF No. 38-1A ¶ 14; ECF No. 38-1B ¶ 33; ECF No. 39-1 ¶ 33).  Plaintiff's testimony is ambiguous about the nature and timing of these

so.  Plaintiff cannot rely on a "pattern of antagonism," following his safety reports, *Kachmar*, 109 F.3d at 177, because the undisputed record demonstrates that Plaintiff did not face antagonism from Berry management following those reports.  In fact, Berry management responded to his complaints, updated the shuttle trailers within three months, and took the drivers out to dinner to try to resolve tension between them stemming from the reports.  (ECF No. 33-2 ¶¶ 11-12; ECF No. 38-1A ¶¶ 11-12; ECF No. 38-1B ¶¶ 41-42; ECF No. 39-1 ¶¶ 41-42.)  After the shuttle trailers were fixed, Berry asked Plaintiff whether he would be willing to switch from working shuttle routes to the Pittston route.  (ECF No. 38-3 at 14).  Plaintiff concedes that "the route was fine. I had no problem with it at all." (*Id.* at 48.)  Indeed, the parties agree that Plaintiff was not disciplined for raising concerns about trailer conditions.  (ECF No. 33-2 ¶ 21; ECF No. 38-1A ¶ 21.)

Finally, while the Court recognizes Plaintiff offers compelling evidence of pretext, and that such evidence may be relevant to the causal connection prong of the *prima facie* case,[8] the Court finds that such evidence is more relevant to Plaintiff's filing the police report in the geese eggs

---

alleged complaints.  (*See* ECF No. 38-3 at 15-16.)  However, Plaintiff makes clear that the protected activity for which he believes he faced retaliation was in connection with the "unsafe shuttle trailers." (ECF No. 38 at 6.)  Based on the ambiguous nature of Plaintiff's testimony and the fact that he stopped performing shuttle routes in January 2022, (ECF No. 38-3 at 14; 48), the Court will only consider the fall 2021 complaints for the CEPA analysis.  *See Weiss v. Pa. Hosp. of the Univ. of Pa.,* Civ. No. 18-3118, 2021 WL 780307, at *5 (E.D. Pa. Feb. 26, 2021) ("A plaintiff's reliance on her own testimony, without further evidence, is insufficient to establish a material issue of fact and overcome a motion for summary judgment." (citing *Solomon v. Soc'y of Auto. Eng'rs.*, 41 F. App'x 585, 586 (3d Cir. 2002))).

[8]    *See Bowles v. City of Camden*, 993 F. Supp. 255, 264 (D.N.J. 1998) ("There is neither logic nor case law which would counsel that the same evidence may not support both plaintiff's initial burden of proving a causal connection for purposes of making a prima facie case and the plaintiff's final burden of casting doubt on the employer's proffered legitimate reason."); se*e also Zaffuto v. Wal-Mart Stores, Inc.*, 130 F. App'x 566, 569 (3d Cir. 2005) ("As recognized by the New Jersey courts, the prima facie element of causation and the element of causation in the subsequent ultimate proof stage of the case are often factually inseparable and therefore a court may rely on evidence provided in the earlier phase in resolving the latter."(citing *Donofry v. Autotote Sys., Inc.*, 795 A.2d 260, 270 (N.J. Super. Ct. App. Div. 2001))).

18

incident; the pretext potentially levied nearly two years after the trailer safety reports is alone insufficient to satisfy Plaintiff's burden. *C.f. McClain v. Avis Rent A Car Sys., Inc.*, 648 F. App'x 218, 224 (3d Cir. 2016) (finding "a party's inconsistent reasons for . . . termination" insufficient "for causation purposes" in light of, *inter alia*, the "substantial gap in the timing" between the protected activity and adverse employment action); *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 504 (3d Cir. 1997) ("Absent evidence of intervening antagonism or retaliatory animus, we conclude that the passage of [19 months] in this case is conclusive and that [the plaintiff] failed to establish a causal link as a matter of law.") Therefore, the Court holds that no causal connection exists between the November 2021 trailer complaints and the August 2023 termination, so Plaintiff has failed to establish his *prima facie* case. The Court grants summary judgment for Berry with respect to the trailer safety complaints.

### 2.    *Geese Eggs Complaint*

Berry argues Plaintiff cannot make out a *prima facie* case with respect to the geese eggs complaint because he failed to establish the second and forth elements—engaging in a protected whistleblower activity and establishing a causal connection. (ECF No. 33-1 at 12-16.) In particular, Berry contends that Plaintiff did not engage in a protected whistleblower activity because he failed to provide advance written notice to his employer as is required under CEPA. (*Id.* at 12-14.) And Berry submits that Plaintiff fails to establish a causal connection because Lilly did not know Plaintiff was the anonymous reporter, and there is no record evidence of antagonism or other facts supporting an inference of retaliation. (*Id.* at 14-16.) Plaintiff responds that he was not required to give advance written notice before filing his report with law enforcement, (ECF No. 38 at 14-19), and that he has satisfied the causal connection prong given Berry's favorable treatment of O'Keefe and evidence that the reduction-in-force explanation for termination was pretextual, (*id.* at 19-25).

19

Berry cites N.J. Stat. Ann. § 34:19-4 for the proposition that Plaintiff was required to provide advance written notice of his complaint to a Berry supervisor. (ECF No. 33-1 at 12.) That provision states:

> The protection against retaliatory action provided by this act pertaining to disclosure to a public body shall not apply to an employee who makes a disclosure to a public body unless the employee has brought the activity, policy or practice in violation of a law, or a rule or regulation promulgated pursuant to law to the attention of a supervisor of the employee by written notice and has afforded the employer a reasonable opportunity to correct the activity, policy or practice. Disclosure shall not be required where the employee is reasonably certain that the activity, policy or practice is known to one or more supervisors of the employer or where the employee reasonably fears physical harm as a result of the disclosure provided, however, that the situation is emergency in nature.

N.J. Stat. Ann. § 34:19-4.

The Supreme Court of New Jersey has made clear that this provision establishes an exhaustion requirement. *See Lippman*, 119 A.3d at 230. ("Through [N.J. Stat. Ann.] § 34:19-4, the [New Jersey State] Legislature has required prior notice to the employer and opportunity to correct the activity, policy, or practice, in order for a putative whistleblower plaintiff to obtain protection against retaliatory action for disclosure made to a public body."). However, *Lippman* clarified that "a whistleblower plaintiff pursuing a cause of action based on disclosure to a public body under [N.J. Stat. Ann. § 34:19-3](a) or [N.J. Stat. Ann. § 34:19-3](b) must demonstrate compliance with N.J. Stat. Ann. § 34:19-4's particular exhaustion requirement" but "the legislative silence on any such requirement applicable to actions brought under [N.J. Stat. Ann. § 34:19–3](c) is deafening." *Id.* at 230-31. Therefore, for Plaintiff's claim to survive, he must have engaged in a protected activity pursuant to N.J. Stat. Ann. § 34:19-3(a) or N.J. Stat. Ann. § 34:19-3(b) *and* complied with the terms of N.J. Stat. Ann. § 34:19-4 *or* engaged in a protected activity pursuant to N.J. Stat. Ann. § 34:19-3(c).

A plaintiff engages in a protected activity under subsection (a) when he "[d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer . . . that the employee reasonably believes . . . is in violation of a law, or a rule or regulation promulgated pursuant to law." N.J. Stat. Ann. § 34:19-3(a). A plaintiff engages in a protected activity under subsection (b) when he "[p]rovides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer." N.J. Stat. Ann. § 34:19-3(b). And a plaintiff engages in a protected activity under subsection (c) when he "[o]bjects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes . . . is in violation of a law, or a rule or regulation promulgated pursuant to law . . . or . . . is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment." N.J. Stat. Ann. § 34:19-3(c).[9] The key difference between the three is that the third makes no reference to a "public body," so, as *Lippman* explained, the exhaustion requirement does not kick in if no public body is implicated.

Plaintiff unequivocally engaged in a protected activity by filing an anonymous report with law enforcement about the geese incident. *See DeLisa v. County of Bergen*, 755 A.2d 578, 582 (N.J. 2000) ("CEPA's protection against employer retaliation extends to employees who communicate information either to employers or public bodies concerning co-employee misconduct encompassed by [N.J. Stat. Ann. §] 34:19–3" (emphasis omitted)). Because Plaintiff made a "disclosure to a public body," he was required to comply with the exhaustion requirement under N.J. Stat. Ann. § 34:19-4 with respect to this protected activity. *Lippman*, 119 A.3d at 388.

---

[9]    A complaint brought against a co-employee is cognizable under each of the three provisions. *See DeLisa v. County of Bergen*, 755 A.2d 578, 582 (N.J. 2000).

21

It is undisputed that Plaintiff failed to provide advance written notice to Berry before filing the anonymous police report.  (*See* ECF No. 33-2 ¶¶ 33, 35; ECF No. 38-1A ¶¶ 33, 35.)  Plaintiff therefore must have satisfied one of the exceptions listed in N.J. Stat. Ann. § 34:19-4 or else his claim fails with respect to this protected whistleblower activity.[10]  Plaintiff argues that notice should be excused because it would have been futile.  (ECF No. 38 at 19.)  CEPA includes two exceptions related to futility: (1) "where the employee is reasonably certain that the activity, policy or practice is known to one or more supervisors of the employer" or (2) "where. . . the employee reasonably fears physical harm as a result of the disclosure provided, however, that the situation is emergency in nature." N.J. Stat. Ann. § 34:19-4.

---

[10]    Plaintiff cites one unpublished New Jersey Appellate Division decision where the court held that the exhaustion requirement under N.J. Stat. Ann. § 34:19-4 did not apply in a case involving the reporting of a single incident of unlawful activity.  (ECF No. 38 at 19 (citing *Barbour v. Asbury Park Hous. Auth.*, No. A-0893-13T4, 2014 WL 10222386, at *4 ((N.J. Sup. Ct. App. Div. Aug. 14, 2015).)  In *Barbour*, the plaintiff alleged he was terminated for reporting to law enforcement—without first providing advanced written notice to upper senior management—that this supervisor improperly took a generator home the day before a hurricane.  *See* 2014 WL 10222386, at *1-2. The court held N.J. Stat. Ann. § 34:19-4 did not apply because the plaintiff alleged only "*a single act* of misconduct" by his direct supervisor." *Id.* at *4 (emphasis in original). The court reasoned that "the legislative intent underpinning N.J. Stat. Ann. § 34:19-4, to provide the employer the opportunity to investigate and correct any unlawful *activity, policy, or practice*, is not undermined by plaintiff's failure to bring this isolated incident to the attention of senior management." *Id.* (emphasis in original).

The Court is unpersuaded by Plaintiff's citation to this unpublished decision.  Based on the plain language of the statute, "activity, policy, or practice" is a term used in both the provision that defines protected activities and the provision that requires advanced written notice. (*Compare* N.J. Stat. Ann. § 34:19-3(a), (b) ("An employer shall not take any retaliatory action against an employee because the employee . . . [d]iscloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer" or "[o]bjects to, or refuses to participate in any activity, policy or practice[.]"), *with* N.J. Stat. Ann. § 34:19-4 ("The protection against retaliatory action provided by this act pertaining to disclosure to a public body shall not apply to an employee who makes a disclosure to a public body unless the employee has brought the activity, policy or practice in violation of a law . . . to the attention of a supervisor of the employee by written notice.").)  If a single incident is not an "activity, policy or practice" within the meaning of N.J. Stat. Ann. § 34:19-4, then it similarly would not fall under the protections of N.J. Stat. Ann. § 34:19-3.  The Court is doubtful the Legislature would intend such a result.

22

Here, the Court is skeptical that the first exception could apply to a scenario where a plaintiff provides verbal notice to a supervisor of a non-supervisor's conduct before filing a report with a public body. This is because such an application of the exception would swallow the rule's requirement of providing *written* notice and a reasonable opportunity to correct the conduct before reporting to a public body. N.J. Stat. Ann. § 34:19-4. Moreover, Plaintiff was not "reasonably certain" that the incident was known to a Berry supervisor.[11] Indeed, Plaintiff's testimony demonstrates that he was *uncertain* as to whether he called Cardona before or after filing the police report.[12] (*See* ECF No. 38-3 at 33 (Plaintiff testifying that "I believe I told her before I filed [the report] that I was going to be filing something"); *id.* (Plaintiff testifying "I think I told her before I was doing it")).) And, the parties agree that Plaintiff "does not know whether he told Cardona that O'Keefe was disturbing geese nests before or after he made the [a]nonymous [r]eport." (ECF No. 33-2 ¶ 38; ECF No. 38-1A ¶ 38.) While it is true that Lopez, Plaintiff's direct supervisor,

---

[11]    Courts have found this first exception applies when a plaintiff reports their *supervisor's* conduct. In these scenarios, plaintiffs are of course "reasonably certain" that the conduct is "known to one or more supervisor," N.J. Stat. Ann. § 34:19-4, because at least one supervisor engaged in that conduct, s*ee, e.g., Krebs v. S. Jersey Port Corp.*, Civ. No. 07-4561, 2008 WL 11510574, at *8 (D.N.J. June 5, 2008) ("[B]ecause [p]laintiff has alleged that these actions were . . . . committed by . . . [Defendant's] Executive Director . . . [p]laintiff was not required to provide written notice of the alleged malfeasance."); *Easley v. N.J. Dep't of Corr.*, No. A-4794-15T2, 2019 WL 3213954, at *18 (N.J. Sup. Ct. App. Div. July 17, 2019) (finding written notice excused when "the unlawful conduct was obviously known to [the supervisor] because he was engaging in it"). Here, by contrast, Plaintiff reported the conduct of O'Keefe—his peer—rather than his supervisor.

[12]    The Court finds Cardona is a "supervisor[]" within the meaning of N.J. Stat. Ann. § 34:19-4. CEPA defines a "supervisor" as "any individual with an employer's organization who has the authority to direct and control the work performance of the affected employee, who has the authority to take corrective action regarding the violation of the law, rule or regulation of which the employee complains, or who has been designated by the employer on the notice required under Section 7 of this Act." *See* N.J. Stat. Ann. § 34:19-2(d). Cardona had "authority to take corrective action" regarding the "violation . . . of which" Plaintiff complained given that she signed O'Keefe's Corrective Action Notice following the geese incident. (*See* ECF No. 38-10.)

testified that Plaintiff informed Lopez of the geese incident during a telephone call, (ECF No. 38-1A ¶ 40; ECF No. 38-1B ¶ 55; ECF No. 39-1 ¶ 55),[13] the record is unclear about whether the call took place before or after Plaintiff filed the report, and Plaintiff testified that he told no supervisor apart from Cardona, (*see* ECF No. 38-3).  Thus, there is no factual dispute as to whether Plaintiff was "reasonably certain" that Lopez was aware of O'Keefe's unlawful conduct before Plaintiff reported it.

As for the second exception, there is no evidence in the record that Plaintiff was faced with a situation that was an "emergency in nature" when he learned that O'Keefe broke geese eggs. N.J. Stat. Ann. § 34:19-4.  Therefore, neither exception applies, and summary judgment on the basis that Plaintiff improperly bypassed N.J. Stat. Ann. § 34:19-4's exhaustion requirement is proper with respect to the protected whistleblowing activity of filing the police report.

Plaintiff argues that in addition to reporting to a public body, Plaintiff informed Human Resources Manager Cardona over the telephone that he was going to—or already did—file a report with the police.  (ECF No. 38 at 17; *see also* ECF No. 38-3 at 30, 33.)  Therefore, Plaintiff contends, informing Cardona constitutes an independent protected activity—whether that be under N.J. Stat. Ann. § 34:19-3(c) or the reporting to a supervisor portion of N.J. Stat. Ann. § 34:19-3(a)—and does not implicate CEPA's exhaustion requirement, which only applies to "disclosure[s] to a public body."  N.J. Stat. Ann. § 34:19-4.

The Court has not been presented with caselaw on whether the exhaustion requirement applies when a plaintiff complains to a public body and provides verbal notice of that complaint to a human resources official.  At least one court in this district has treated an internal written

---

[13]   Plaintiff does not argue that this call constitutes a protected activity.  (*See generally* ECF No. 38.)

complaint as both advanced written warning of an external complaint and as its own independent protected activity. *See Bowen v. Parking Auth. of Camden*, Civ. 00-5765, 2003 WL 22145814, at *17-18 & n.44 (D.N.J. Sep. 18, 2003) (finding plaintiffs engaged in protected activity "first by disclosing activities that he believed were unlawful to his supervisors, second by threatening to disclose the activities to law enforcement and third by disclosing the activities to law enforcement" and noting that the plaintiffs' "internal complaints . . . are just as protected as his complaints to law enforcement"). Regardless, even if the Court were to conclude that Plaintiff's call to Cardona constituted a CEPA-protected activity under N.J. Stat. Ann. § 34:19-3(c), the Court finds Plaintiff has failed to establish a causal connection between this protected activity and Plaintiff's termination.

The Court finds Plaintiff has failed to establish a causal connection between his call to Cardona and Plaintiff's termination for several reasons. First, Plaintiff does not even appear to argue there is a causal connection between his termination and his call to Cardona. Instead, Plaintiff relies on the connection to the police report. (*See, e.g.,* ECF No. 38 at 6 ("Plaintiff's termination followed his report that a co-worker . . . had disturbed and destroyed protected wildlife on company property. Plaintiff made a report to the Monroe Township Police[.]"); *id.* at 21 ("[I]n the aftermath of Plaintiff's complaint to law enforcement, the actions of Defendant's management . . . are suspect").)

Second, while there is a factual dispute as to whether Lilly knew Plaintiff authored the police report, there is no evidence in the record to suggest that Lilly knew Plaintiff called Cardona or knew about the substance of that call prior to terminating Plaintiff. *See Tegler*, 291 F. Supp. 3d at 588-89 ("[A] plaintiff cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at

the time they acted." (internal quotation marks and citation omitted)).  Indeed, the evidence Plaintiff relies on to establish a genuine issue of fact as to Lilly's knowledge of the police report nowhere indicates Cardona spoke to Lilly about her telephone conversation with Plaintiff.  (*See* ECF No. 38 at 21-22.)  And in Cardona's own deposition, she does not mention receiving a call from Plaintiff nor informing Lilly about that call.  (*See* ECF No. 38-8 at 9-10.)

Third, much of the evidence that would likely raise an inference of causation with respect to the filing of the police report is inapplicable to the call to Cardona.  Namely, Lilly's preferential treatment towards O'Keefe—advising O'Keefe to "calm down" after he was notified by law enforcement, paying off his fine, deflecting attention away from the fine, and failing to send O'Keefe a formal Corrective Action Notice—was treatment in response to the police report, not in response to Plaintiff's call with Cardona.  The only remaining evidence pertains to the inconsistent justifications and procedural irregularities in Plaintiff's termination, but the Court finds that, without more, Plaintiff has failed to establish a causal connection between the termination and the call to Cardona.  *C.f. McClain*, 648 F. App'x at 224 (finding "a party's inconsistent reasons for . . . termination" insufficient "for causation purposes" when, *inter alia*, plaintiff failed to "present[] . . competent evidence that . . . [the] decision-maker, was aware of the [protected activity] at the time he made the decision to terminate[.])

Because Plaintiff has failed to meet his burden with respect to the causation element of his retaliation claim in connection with calling Cardona—and because Plaintiff's claim cannot move forward with respect to the protected whistleblowing activities of complaining about the trailers

and filing the police report—the Court grants summary judgment for Berry on Plaintiff's lone CEPA claim.[14]

## IV.   CONCLUSION

For the foregoing reasons, and other good cause shown, Berry's Motion for Summary Judgment (ECF No. 33) is **GRANTED**.  An appropriate Order follows.

Dated: May 13, 2026

GEORGETTE CASTNER
UNITED STATES DISTRICT JUDGE

---

[14]   Berry argues that if Plaintiff's claim survives summary judgment, Plaintiff is not entitled to punitive damages.  (ECF No. 33-1 at 19.)  Because Plaintiff's claim has not survived summary judgment, this argument is moot.